UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FONTAINE BROS., INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:18-cv-11636-KAR |
| ) | |
| ACADIA INSURANCE COMPANY and ) | |
| UNION INSURANCE COMPANY, ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM & ORDER
REGARDING PLAINTIFF'S AND DEFENDANTS'
CROSS MOTIONS FOR SUMMARY JUDGMENT
(Dkt. Nos. 22 & 25)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

In 2009, the City of Worcester ("the City") contracted with Fontaine Brothers, Inc.

("Plaintiff") for the installation of a new ice refrigeration system at the City's indoor ice rink at

the DCU Center.  On April 29, 2015, after the condensers in two chiller units eroded and stopped

operating, the City filed suit against Plaintiff, seeking to recover for the costs of leasing

temporary chillers and installing new ones.  This action by Plaintiff against Acadia Insurance

Company and Union Insurance Company ("Defendants") seeks to resolve whether an insurance

policy issued to Plaintiff by Defendants obligated them to defend and indemnify Plaintiff against

liabilities incurred in the lawsuit brought by the City.  Defendants removed the case to this court

on the basis of diversity, *see* 28 U.S.C. § 1332(a) and 1441(a), and the parties consented to this

court's jurisdiction (Dkt. No. 11).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  The court heard

argument from the parties on April 1, 2019 and took the motions under advisement (Dkt. No.

1

34).  For the reasons set forth below, the court denies Plaintiff's motion and allows Defendants' motion.

II.  <span style="font-variant: small-caps;">Applicable Legal Standards</span>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the court must "consider[] the record and all reasonable inferences therefrom in the light most favorable to the non-moving part[y].  Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism."  *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010).  Interpretation and application of the relevant provisions of an insurance policy are questions of law often suitable for resolution on summary judgment.  *See Zurich Am. Ins. Co. v. Elec. Maine, LLC*, 927 F.3d 33, 35 (1st Cir. 2019); *see also Utica Mut. Ins. Co. v. Herbert H. Landy Ins. Agency, Inc.*, 820 F.3d 36, 41 (1st Cir. 2016) ("'Where [as here] facts are not in dispute, the interpretation and application of the [insurance] policy language is a question of law.'" (quoting *Massamont Ins. Agency, Inc. v. Utica Mut. Ins. Co.*, 489 F.3d 71, 72 (1st Cir. 2007) (alterations in original))); *Nascimento v. Preferred Mut. Ins. Co.*, 513 F.3d 273, 276 (1st Cir. 2008) ("Under Massachusetts law, the interpretation of an insurance policy and the application of policy language to known facts pose questions of law for the court to decide.").

The parties agree that Massachusetts law governs this dispute.[1]  Under Massachusetts law, the insured bears the initial burden of establishing that the case involves a generally covered

---

[1] Both parties cite to Massachusetts case law in support of their respective positions (Dkt. Nos. 23 at 3-4; 26 at 6-7).

risk under the policy. *See Sterngold Dental, LLC v. HDI Global Ins. Co.*, 929 F.3d 1, 6 (1st Cir. 2019); *Stor/Gard, Inc. v. Strathmore Ins. Co.*, 717 F.3d 242, 247 (1st Cir. 2013); *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.3d 399, 404 (1st Cir. 2009) (citing *Highlands Ins. Co. v. Aerovox Inc.*, 676 N.E.2d 801, 804 (Mass. 1997)). If the insured makes this showing, "it falls to the insurer 'to prove the applicability of one or more separate and distinct exclusionary provisions.'" *Essex Ins. Co.*, 562 F.3d at 404 (quoting *B & T Masonry Const. Corp. v. Pub. Serv. Mut. Ins. Co.*, 382 F.3d 36, 39 (1st Cir. 2004) (citing *Highlands Ins. Co.*, 676 N.E.2d at 804)). "Where there is doubt over the meaning of a term, it is 'appropriate to consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.'" *U.S. Liability Ins. Co. v. Benchmark Const. Servs., Inc.*, 797 F.3d 116, 120 (1st Cir. 2015) (quoting *Trs. of Tufts Univ. v. Commercial Union Ins. Co.*, 616 N.E.2d 68, 72 (Mass. 1993)).

"'It is settled that an insurer's duty to defend is independent from, and broader than, its duty to indemnify.'" *Metro. Prop. & Cas. Ins. Co. v. Morrison*, 951 N.E.2d 662, 667 (Mass. 2011) (quoting *A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund*, 838 N.E.2d 1237, 1256 (Mass. 2005)).

> [T]he Massachusetts Supreme Judicial Court has stated that "[a]n insurer has a duty to defend an insured when the allegations in a complaint are reasonably susceptible of an interpretation that states or roughly sketches a claim covered by the policy terms.... In order for the duty of defense to arise, the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage. However, when the allegations in the underlying complaint lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate or defend the claimant. The nature of the claim and not the ultimate judgment against the insured triggers the duty to defend even though the plaintiff may not succeed and the claim may, in fact, be weak or frivolous... ."

*Utica Mut. Ins. Co.*, 820 F.3d at 41 (quoting *Morrison,* 951 N.E.2d at 667) (citations and internal formatting omitted in original).

III.   BACKGROUND[2]

A.  Worcester's Lawsuit

On April 29, 2015, the City of Worcester ("the City") brought suit against Plaintiff, among others,[3] alleging breach of contract (Count One) and negligence (Count Two) stemming from the breakdown and failure of critical components of two ice rink refrigeration units that Plaintiff had been contracted to install (Dkt. No. 27-1 at 1).  Six years earlier, in May 2009, the City entered into a multi-million-dollar contract with Plaintiff "to install a brand-new ice refrigeration system, to include, among other equipment and infrastructure, two reciprocating glycol brine chiller packages" at an indoor ice rink known as the DCU Center (Dkt. No. 32 at 1, 3, ¶¶ 2, 6; Dkt. No. 1 at 1, ¶ 6).  Plaintiff (or its subcontractors) installed two refrigeration units, and by October 2009, they were operational (Dkt. No. 27-1 at 2, ¶ 14).  The City's lawsuit alleged that within four years of the installation, the condensers within the refrigeration units failed because (1) Plaintiff installed condensers with carbon steel tubes instead of contractually-required stainless steel tubes and (2) Plaintiff and its subcontractors did not adequately maintain the condensers, also in breach of the contract (Dkt. No. 27-1 at 1, ¶ 2).  The City's complaint also

---

[2] The facts are drawn from Plaintiff's and Defendants' Statements of Material Facts (Dkt. Nos. 24 & 28), Plaintiff's Response to Defendants' Statement of Material Facts (Dkt. No. 29), Defendants' Response to Plaintiff's Statement of Material Facts (Dkt. No. 32) and related documents.  The court includes some facts stated by Plaintiff that are denied by Defendants on the basis that Plaintiff has provided no supporting indicia of admissible evidence (*see, e.g.*, Dkt. No. 32 at 5, ¶ 17) because these disputed facts are not material to the legal questions before the court and supply helpful background.

[3] The City's complaint also named Federal Insurance Company, alleged to be Plaintiff's surety; Sasaki Associates, Inc., alleged to be the architect of record for the construction project; Henry J. Coupe, alleged to be Sasaki's subcontractor; and SMG, alleged to have managed and operated the DCU Center (Dkt. No. 27-1 at 2-3, ¶¶ 6-9).

sought indemnification (Count Three) from Plaintiff for costs the City incurred based on Plaintiff's alleged breach of contract and negligence (Dkt. No. 27-1 at 19, ¶ 132).

The City alleged the following in its complaint:

- The City entered into an Owner-Contractor Agreement ("Agreement") with Plaintiff, dated May 26, 2009, for a contract price of $4,447,000, whereby Plaintiff agreed to "'provide all the supplies, materials and equipment, and perform all labor, services and supervision necessary and proper to undertake and complete the DCU Center Ice System & Electrical project'" (Dkt. No. 27-1 at 5, ¶ 20 (quoting the Agreement));

- A material component of the Agreement required Plaintiff to install a new ice refrigeration system, in part composed of two reciprocating glycol brine chiller packages ("chillers") (Dkt No. 27-1 at 5, ¶ 21);

- The Agreement required that the condenser components of the chillers have stainless steel tubes and tube sheets, while the remaining parts of the condenser were to consist of carbon steel (Dkt. No. 27-1 at 6, ¶ 23);

- One provision of the Agreement stated that "'all materials and equipment furnished … and … all Work will be … in conformance with the Contract Documents.  All Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective'" (Dkt. No. 27-1 at 6, ¶ 26 (quoting the Agreement) (alterations in original);

- The Agreement named Plaintiff as the entity "'responsible for determining that all materials furnished for the Work meet all the requirements of the Contract Documents'" (Dkt. No. 27-1 at 6, ¶ 27 (quoting the Agreement));

- The Agreement also called for Plaintiff to maintain the new equipment and set out specifications for how that maintenance was to be performed (Dkt. No. 27-1 at 7, ¶¶ 29-32);

- The Agreement called for Plaintiff to hire a subcontractor for purposes of proper maintenance, but the contract terms provided that Plaintiff would "'be responsible to [the City] for the acts and omissions of his employees, Subcontractors, and their agents and employees, and other persons performing any of the Work under a contract with [Plaintiff]'" (Dkt. No. 27-1 at 7, ¶ 32-34 (quoting the Agreement));

- Plaintiff approved a submittal for a subcontractor that included a plan, dated July 2, 2009 (revised July 8, 2009), for condensers containing carbon steel tubes and tube sheets (Dkt. No. 27-1 at 10, ¶¶ 49-53);

- Plaintiff certified on that submittal that "it had reviewed the submittal for compliance with the contract documents," despite that fact that the submittal did not conform to the contract specifications and there was no authorization for the change (Dkt. No. 27-1 at 10, ¶¶ 46, 52);

- In September 2009, Plaintiff installed the two chiller packages containing condensers with carbon steel tubes and tube sheets, which became operational in October 2009 (Dkt. No. 27-1 at 10, ¶¶ 55-56);

- In accordance with the Agreement, Plaintiff hired subcontractors to maintain and service the chillers (Dkt. No. 27-1 at 11, ¶ 57);

- The subcontractors failed to properly maintain the condensers in the chillers (Dkt. No. 27-1 at 11, ¶ 58);

- "Even if [Plaintiff's] subcontractors were under the incorrect assumption that the condensers contained stainless steel tubes and tube sheets, the corrosion and one of its main causes should have been discovered during the exercise of routine maintenance and water treatment." (Dkt. No. 27-1 at 11-12, ¶ 63);

- After the termination of Plaintiff's year-long maintenance period, another entity assumed responsibility for servicing the ice rink refrigeration equipment in 2010 (Dkt. No. 27-1 at 12, ¶¶ 65-69);

- By October 2011, signs of corrosion in one of the condensers were apparent, as it "contained orange/dark brown … muddy chips with a fair amount of magnetic material" (Dkt. No. 27-1 at 13, ¶ 76 (alterations in original));

- In September 2013, the City was made aware of the advanced level of corrosion in the condensers that resulted from Plaintiff's or Plaintiff's subcontractor's failure to adequately service and maintain the chillers, in contravention of the Agreement (Dkt. No. 27-1 at 14, ¶¶ 83-88);

- Without properly functioning condensers, the chiller units could not operate and the ice rink was unusable (Dkt. No. 27-1 at 14, ¶ 89);

- The City leased two temporary chillers for the ice rink to ensure that the Worcester Sharks, the City's hockey franchise in the American Hockey League, could start its season on schedule (Dkt. No. 27-1 at 4 & 14-15, ¶¶ 18 & 89-91);

- The City "ordered and installed two replacement condensers, each containing approximately 300 stainless steel tubes and stainless steel tube sheets," which became operational in February 2014 (Dkt. No. 27-1 at 15, ¶¶ 97-98); and

- "In ordering the two temporary chiller units and the two replacement condensers, the City [] incurred damages in the amount of $529,139.00," in addition to administrative costs of $25,153.60 (Dkt. No. 27-1 at 16, ¶¶ 102-03).

The City's ten-count complaint sought to hold all defendants jointly and severally liable for the total of $554,292.60 in damages for the costs of temporary chiller units, replacement condensers, and the administrative costs associated with discovery and replacement of the failed units (Dkt. No. 27-1 at 28). Ultimately, Plaintiff reached a global settlement of all claims against it. On July 28, 2017, the City's lawsuit was dismissed with prejudice after the parties filed a stipulation of dismissal (Dkt. No. 24-5 at 3).

B. Policy and Denial of Coverage

Union Insurance Company issued a policy,[4] numbered CPA 0110270-21 ("the Policy"), to Plaintiff for the policy period October 1, 2012 through October 1, 2013 (Dkt. No. 27-1 at 29). The Policy was, in industry parlance, a Commercial General Liability Coverage policy, or CGL policy (Dkt. No. 27-1 at 30-46). *See Am. Home Assurance. Co. v. AGM Marine Contractors, Inc.*, 467 F.3d 810, 811 (1st Cir. 2006). In general, the Policy provided that Defendants "will pay those sums that the insured becomes legally obligated to pay as damages because of … 'property damage' to which this insurance applies" (Policy Sec. I(1)(a), Dkt. No. 27-1 at 30) if the "'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'" during the policy period (Policy Sec. I(1)(b)(1) & (b)(2), Dkt. No. 27-1 at 30). On March 25, 2015, Defendant Acadia Insurance Company ("Acadia") sent Plaintiff a letter, acknowledging that it had been "placed on notice" of the City's claim against Plaintiff (Dkt. No. 24-3 at 1). The

---

[4] Plaintiff represents that it named both Union Insurance and Acadia Insurance as defendants out of an abundance of caution because Plaintiff received correspondence relating to the Policy from each defendant (Dkt. No. 23 at 1 n.1).

letter explained that the Policy did not afford coverage for the City's claims, referencing the Policy's exclusions for certain "property damage" or "impaired property" and asserting that the claims alleged by the City would not qualify as an occurrence as that term was defined in the Policy (Dkt. No. 24-3 at 3).

After the City filed suit, Plaintiff renewed its request for a defense and indemnification under the Policy. In response, on June 4, 2015, Plaintiff received a letter on Acadia letterhead stating that the letter was written on behalf of "Union Insurance Company ('Acadia')" again declining to provide a defense or to indemnify Plaintiff against the City's claims (Dkt. No. 24-4 at 4). The letter explained that:

> the Policy's insuring agreement extends coverage to sums that [Plaintiff] may become legally obligated to pay as damages because of "property damage" caused by an "occurrence." Against this coverage grant, the [City's] complaint alleges that [Plaintiff] failed to construct the refrigeration system for the DCU Center's ice rink in conformance with the Contract's specifications by utilizing condensers comprised of carbon steel tubes and tube sheets, rather than stainless steel tubes and tube sheets, which caused the condensers to corrode. The [City's] complaint also alleges that [Plaintiff] improperly maintained the completed refrigeration system, which caused the condensers to corrode further.
>
> Property Damage sustained as a result of an insured's faulty work performance does not qualify as "'property damage' caused by an 'occurrence'" – i.e. property damage caused by an "accident" – as required by the Policy's insuring agreement. As such, Acadia disclaims defense and indemnity coverage for the potential liabilities that the [City] alleges on that basis.

(Dkt. No. 24-4 at 4). Defendants also asserted that the exclusion for "impaired property" precluded coverage.

IV.    ANALYSIS

Plaintiff contends that Defendants are in breach of the Policy because the City's suit alleged property damage in the form of corrosion of the condensers that occurred during the policy period and that no exception applies to excuse coverage. For their part, Defendants

contend that the underlying suit alleged faulty workmanship by Plaintiff that did not constitute property damage caused by an occurrence or, alternatively, that one of the Policy's exclusions barred coverage.[5]  The court turns first to whether Plaintiff can "show[] that the allegations in the underlying complaint fit within the covered risks in the policy."  *Essex Ins. Co.*, 562 F.3d 399, 404.  "There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage."  *Sterilite Corp. v. Cont'l Cas. Co.*, 458 N.E.2d 338, 341 (Mass. App. Ct. 1983) (quoting *Union Mut. Fire Ins. Co. v. Inhabitants of Town of Topsham*, 441 A.2d 1012, 1015 (Me. 1982)).  If the allegations in the underlying complaint can reasonably be construed as making out a claim that would trigger coverage, then Defendants had a duty to defend.  *Essex Ins. Co.*, 562 F.3d at 403.

A.    The Policy's General Liability Coverage

The Policy obligates Defendants to "pay those sums that the insured becomes legally obligated to pay as damages because of … 'property damage' to which this insurance applies" (Policy Sec. I(1)(a), Dkt. No. 27-1 at 30).  Property damage is covered if "caused by an 'occurrence' that takes place in the 'coverage territory'" and during the policy period (Policy Sec. I(1)(b), Dkt. No. 27-1 at 30).  The Policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property" (Policy Sec. V(17)(a), Dkt. No. 27-1 at 44).  An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions (Policy Sec. V(13), Dkt. No. 27-1 at 43).  A basic principle of contract interpretation is that "words in insurance policies are given their usual and ordinary meaning."  *Mills Constr. Corp., Inc. v. Nautilus Ins. Co.*, No. 1:18-cv-

---

[5]  The court need not, and does not, address Defendants' contention that defendant Acadia is entitled to summary judgment on the separate ground that Union, not Acadia, issued the Policy (Dkt. No. 26 at 6).

10549-IT, 2019 WL 1440404, at *3 (D. Mass. Mar. 31, 2019) (citing *Hakim v. Mass. Insurers'*
*Insolvency Fund*, 424 Mass. 275, 280 (1st Cir. 1997)). "Accident" is commonly defined as "'an
unexpected happening without intention or design.'" *Liberty Mut. Ins. Co. v. Tabor*, 553 N.E.2d
909, 912 (Mass. 1990) (quoting *Beacon Textiles Corp. v. Emp'rs Mut. Liab. Ins. Co.*, 246 N.E.2d
671, 673 (Mass. 1969)). The term can also encompass "'[u]nintended or unforeseen
consequences of reckless or negligent acts.'" *Id.* (quoting *Vappi & Co. v. Aetna Cas. & Sur. Co.*,
204 N.E.2d 273, 276 (Mass. 1965)). "Massachusetts courts broadly construe the term 'accident'
in an insurance policy." *Hanover Ins. Grp., Inc. v. Raw Seafoods, Inc.*, 73 N.E.3d 831, 835
(Mass. App. Ct. 2017).

The parties dispute whether the corrosion in the condensers, alleged by the City to be
attributable to Plaintiff's use of carbon steel, rather than stainless steel, tubes and tube sheets in
the condensers and to faulty maintenance, constituted an "occurrence" under the Policy.
Defendants argue "that as a matter of Massachusetts law, faulty workmanship cannot constitute
an occurrence." *Gen. Cas. Co. of Wis. v. Five Star Bldg. Corp.*, Civil Action No. 11-30254-DJC,
2013 WL 5297095, at *4 (D. Mass. Sept. 19, 2013). This argument is premised on the principle
that "CGL coverage is primarily directed to liabilities *other* than defects in one's own work,"
*Am. Home Assurance Co.*, 467 F.3d at 812, a principle that the Massachusetts Supreme Judicial
Court ("SJC") has apparently endorsed: "'The risk intended to be insured is the possibility that
the goods, products or work of the insured, once relinquished or completed, will cause bodily
injury or damage to property *other than to the product or completed work itself ... .*" *Id.* at 812-
13 (emphasis supplied) (quoting *Commerce Ins. Co. v. Betty Caplette Builders, Inc.*, 647 N.E.2d
1211, 1213 (Mass. 1995) (quoting Roger C. Henderson, *Insurance Protection for Products
Liability and Completed Operations: What Every Lawyer Should Know*, 50 Neb. L. Rev. 415,

441 (1971)); citing *Farmington Cas. Co. v. Duggan*, 417 F.3d 1141, 1142 (10th Cir. 2005); *Modern Equip. Co. v. Cont'l W. Ins. Co.*, 355 F.3d 1125, 1129 (8th Cir. 2004); Russ, 9A *Couch on Insurance* § 129:1 (3d ed. 1995)).

Based on this principle, "[s]ome courts have held that faulty workmanship by the insured, so far as damage is only to its product, does not constitute an 'occurrence' under CGL policies, and others have held that faulty workmanship does not constitute 'property damage.'" *Id.* at 813 (*comparing Auto-Owners Ins. v. Hope Pride Cos.*, 684 N.W.2d 571, 577 (Neb. 2004) (holding that faulty workmanship does not constitute an occurrence), *with Amtrol, Inc. v. Tudor Ins. Co.*, 2002 WL 31194863, at *6 (D. Mass. 2002) (holding that faulty workmanship does not constitute property damage)); *see also Friel Luxury Home Const., Inc. v. ProBuilders Specialty Ins. Co. RRG*, Civil Action No. 09-cv-11036-DPW, 2009 WL 5227893, at *5 (D. Mass. Dec. 22, 2009) (adopting the view that CGL policies are not intended to pay the costs associated with repairing or replacing the insured's defective work and products); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Modern Cont'l Const. Co.*, No. 082015BLS1, 2009 WL 6376180, at *3 (Mass. Super. Dec. 11, 2009). Perhaps because the SJC "has not decisively circumscribed the bounds of what constitutes an occurrence," *Five Star Bldg. Corp.*, 2013 WL 5297095, at *5, "other courts have focused solely upon the exclusions of the CGL policy." *Am. Home Assurance Co.*, 467 F.3d at 413 (citing *Caplette*, 647 N.E.2d at 1213). *See, e.g., Am. Home Assurance Co.*, 467 F.3d at 413, (assuming *arguendo* that there was an occurrence and property damage within the meaning of the policy and moving on to an analysis of the disputed exclusion).

The City alleged that Plaintiff supplied condensers with carbon steel components instead of the stainless steel components called for by the contract, causing premature corrosion in components of the chillers and that Plaintiff's substandard maintenance of the condensers further

contributed to the corrosion.  Thus, the City's complaint plainly alleged faulty workmanship on the part of Plaintiff.  Nonetheless, while the question is not free from doubt and there are cases expressing a contrary view, the court concludes that the allegations in the complaint paint a scenario that could constitute an occurrence as defined in the policy.  Courts have recognized that, while "[f]aulty workmanship, alone, is not an 'occurrence,'" coverage may lie when "'faulty workmanship … causes an accident.'"  *Davenport v. U.S. Fid. & Guar. Co.*, 778 N.E.2d 1038 (Mass. App. Ct. 2002) (table) (quoting *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 796 (N.J. 1979)); *see also Five Star Bldg. Corp.*, 2013 WL 5297095, at *5 (collecting cases involving claims under CGL policies involving faulty workmanship).  In *B&T Masonry Const. Co. Inc.*, 382 F.3d 36, the First Circuit held without extended discussion that the plaintiff insured had "satisfied its threshold burden of showing coverage under an insuring agreement."  *Id.* at 39.  In the *B & T Masonry* case, the plaintiff insured was a subcontractor that had performed masonry work on a construction project for the City of Everett.  After construction was complete, Everett sued Barletta Engineering Corporation, the general contractor, for water damage to the building which, Everett alleged, was caused by faulty construction.  Barletta, in turn, sued its subcontractor B & T (among others), alleging that B & T's deficient masonry work caused the damage to the building alleged by Everett.  *Id.* at 37.  The insuring agreement in the CGL policy at issue in the *B & T Masonry* case appears, insofar as relevant, to have been the same as the insuring agreement at issue in the instant case.  As in this case, the claim against B & T was premised on faulty workmanship by the insured that caused or resulted in damage to a building owned by the entity that contracted for the construction work.

In the instant case, there is no allegation in the City's complaint that Plaintiff intentionally or deliberately authorized or approved the use of nonconforming condensers in the

project.  While deliberate or intentional misconduct is possible in light of the complaint's allegations, it is also possible that the authorization to use carbon steel components rather than stainless steel components in the condensers was the result of negligence in the course of a complex construction project.  The SJC has said that "injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." *Quincy Mut. Fire Ins. Co. v. Abernathy*, 469 N.E.2d 797, 799 (Mass. 1984).  The City's complaint does not allege that Plaintiff intended the condensers to corrode and leaves open the possibility that Plaintiff was unaware of any potential problem or did not foresee the corrosion likely to result from the use of carbon steel components or the maintenance work being done by its subcontractor.  In other words, the City's complaint does not foreclose the possibility that the corrosion resulting from Plaintiff's alleged faulty workmanship and maintenance might be shown to be an unforeseen or unintended consequence of reckless or negligent conduct.

There is a difference between the *B &T Masonry* case and the instant case:  the property damage allegedly caused by B & T Masonry's deficient masonry work arose from water leakage into the building and included mold contamination of ceilings, walls, floors, and other components.  The property damage was not confined to the masonry work itself.  *See B & T. Masonry Constr. Co., Inc.*, 382 F.3d at 37; *see also Five Star Bldg. Corp.*, 2013 WL 5297095, at *3 (involving allegations in the underlying complaint that the insured's temporary roof patches failed during a rainstorm, allowing rainwater to soak insulation and cause damage to the interior of the building and its contents).  Here, in contrast, the complaint alleged property damage confined to the condensers which Plaintiff's subcontractor supplied.  But the definition of an accident in Massachusetts case law does not appear to turn on the question of whether the

property damage caused by the occurrence was limited to property supplied by or on behalf of the insured.  Any bar to coverage is best addressed under the business risk exclusions in the Policy, to which the court turns next.  *See B & T Masonry Const. Co., Inc.*, 382 F.3d at 39.

B.       Business Risk Exclusions

While the court has concluded that it is possible to read the underlying complaint as asserting an occurrence as defined in the Policy, the court further finds that an applicable business risk exclusion applies to relieve Defendants of any duty to defend or indemnify. Subsection (m) of the Policy, titled "Damage To Impaired Property or Property Not Physically Injured" (hereinafter "the Impaired Property exclusion"), lists as an exclusion "'[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of: (1) A defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work'; or (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms" (Policy Sec. I(2)(m), Dkt. No. 27-1 at 34).  "[I]mpaired property" is defined as tangible property, other than "your product" or "your work," that is useless or less useful because (a) it includes "your product" or "your work," which is "defective, deficient, inadequate or dangerous," or (b) "[y]ou have failed to fulfill the terms of a contract or agreement[,] if such property can be restored to use by the repair, replacement, adjustment or removal of 'your product' or 'your work' or your fulfilling the terms of the contract agreement" (Policy Sec. V(8), Dkt. No. 27-1 at 42).  In turn, the policy defines "your product" as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" the insured or others trading in the insured's name (Policy Sec. V(21)(a), Dkt. No. 27-1 at 44).  "Your work" is defined as "(1) [w]ork or operations performed by you or on your behalf;

and (2) [m]aterials, parts or equipment furnished in connection with such work or operations" (Policy Sec. V(22)(a), Dkt. No. 27-1 at 45).

Exclusions such as this one, which are "commonly referred to as 'business risk exclusions[,]' … serve to deny coverage for certain types of claims that relate directly to the insured's faulty workmanship, as opposed to damage caused to a third party." *Essex Ins. Co.*, 562 F.3d at 401. "The business risk exclusions reflect the proposition that certain business risks 'are a normal, foreseeable and expected incident of doing business and should be reflected in the price of the product or service rather than as a cost of insurance to be shared by others.'" *Friel Luxury Home Const., Inc.*, 2009 WL 5227893, at *6 (quoting *Essex Ins. Co.,* 562 F.3d at 407). "The goal of a general liability policy 'is to protect the insured from the claims of injury or damage to others, but not to insure against economic loss sustained by the insured due to repairing or replacing its own defective work or products.'" *Pac. Indem. Co. v. Lampro*, 12 N.E.3d 1037, 1043 (Mass. App. Ct. 2014) (quoting *Betty Caplette Builders, Inc.*, 647 N.E.2d at 1213 (quoting 2 R. Long, Liability Ins. § 11.09(2) (1993)); *see also Insituform Techs., Inc. v. Am. Home Assurance Co.*, 566 F.3d 274, 275 (1st Cir. 2009) ("CGL policies are primarily directed at liability sought to be imposed by a third party and often exclude coverage for mistakes in the insured's own product or work.").

Turning to the City's complaint, the question is whether the allegations in the triggering complaint "generally demonstrate a possibility that the liability claim falls within the scope of the insurance policy." *Sterngold Dental LLC*, 929 F.3d at 6. Plaintiff cannot escape the application of the Impaired Property exclusion here. The Policy defines "[y]our work" to include "[m]aterials, parts or equipment furnished in connection with '[w]ork or operations performed by you or on your behalf]'" (Policy Sec. V(22)(a), Dkt. No. 27-1 at 45). Under both

subparts of the Impaired Property exclusion, whether the DCU Center is considered "impaired property" or "property that has not been physically injured," the damage and resulting loss arose from Plaintiff's work in the form of faulty parts or equipment and Plaintiff's failure to perform an agreement in accordance with its terms (Policy Sec. I(2)(m), Dkt. No. 27-1 at 34). Furthermore, the property was "restored to use" by the removal and repair of Plaintiff's product and work (Policy Sec. V(8), Dkt. No. 27-1 at 42).

The City contracted with Plaintiff to replace the "ice system and electrical infrastructure" of the ice rink, a part of the larger arena (Dkt. No. 27-1 at 1, ¶ 1). Under the contract, Plaintiff was responsible for "install[ing] a brand new ice refrigeration system, to include, among other equipment and infrastructure, two reciprocating glycol brine chiller packages," components of which were water cooled condensers with stainless steel tubes and tube sheets (Dkt. No. 27-1 at 5-6, ¶¶ 21, 23). According to the complaint, stainless steel is preferable to carbon steel because stainless steel is less susceptible to corrosion and requires less intensive maintenance (Dkt. No. 27-1 at 6, ¶ 24). Because Plaintiff installed carbon steel tubes and tube sheets – contrary to the agreement specifications – the condensers suffered severe corrosion within four years, rendering them inoperable (Dkt. No. 27-1 at 14, ¶¶ 84-87). "Without properly functioning condensers, both refrigeration units could not be operated" and the City faced the possibility of not having "a safe and reliable ice surface for the upcoming hockey season" (Dkt. No. 27-1 at 14, ¶¶ 89-90). The faulty condensers were equipment furnished in connection with work or operations performed by Plaintiff or on its behalf, and the condensers impaired the operations of the DCU Center ice rink.

The corrosion that damaged the condensers cannot be considered "sudden and accidental physical injury" that would fit into the exception to the exclusion (Policy Sec. I(2)(m), Dkt. No.

27-1 at 34).  *See Essex Ins. Co.*, 562 F.3d at 401 (noting that certain business risk exclusions contain exceptions which, if applicable, restore coverage to the insured).  "Under Massachusetts law, 'sudden' carries a temporal element requiring an abrupt, non-gradual" event or change in condition. *House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co., Inc.*, 775 F. Supp. 2d 302, 312 (D. Mass. 2011) (citing *Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.*, 555 N.E.2d 568, 572 (Mass. 1990)).  The City's complaint alleges that the corrosion was first discovered in October 2011, two years after the chillers became operational (Dkt. No. 27-1 at 10, 13, ¶¶ 56, 76) and that the condensers stopped functioning in September 2013 due to the excessive levels of corrosion that had built up since their installation (Dkt. No. 27-1 at 14, ¶¶ 83-89).  Four years of corrosion that worsened every year, finally resulting in failure, cannot be considered "sudden." Further supporting the application of the exclusion is the allegation in the City's complaint that the ice rink was restored to functionality by the leasing of temporary chillers and the replacement of the condensers installed by Plaintiff (Dkt. No. 27-1 at 15, ¶¶ 91-97).  The alleged conditions at the DCU Center thus fit the definition of "impaired property" in the Policy:

> "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
> > a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
> > b. You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract agreement.

(Policy Sec. V(8), Dkt. No. 27-1 at 42).

Plaintiff's sole argument against the application of this exclusion is that "[s]ince the installation and maintenance of the condensers, the property at issue that was damaged, was not [Plaintiff's] 'work' or 'product,' [Plaintiff] could not have, and did not, reasonably understand

this exclusion to bar coverage for property damage to third-party property such as the condensers" (Dkt. No. 30 at 5). This contention ignores unambiguous language in the Policy. The City's complaint alleges that Plaintiff was "the general contractor for the construction project that is the subject matter of [the City's] lawsuit (Dkt. No. 27-1 at 2, ¶ 5) and that Plaintiff "agreed to 'provide all the supplies materials and equipment, and perform all the labor, services and supervision necessary'" for the project (Dkt. No. 27-1 at 5, ¶ 20 (quoting the agreement between Plaintiff and the City)). The City's complaint thus alleges that the condensers and their maintenance were Plaintiff's product or work as those terms are defined in the Policy. *See Am. Home Assurance Co.*, 467 F.3d at 814 (rejecting the argument that floating docks that were not manufactured by the insured were not its product under the applicable CGL policy definitions).

Plaintiff's reliance on *Essex Insurance Co.* is inapposite. In that case, the First Circuit found a similar exclusion inapplicable because the underlying complaint alleged physical injury to a building requiring remediation distinct from replacement and removal of the insured's product or work. In *Essex Ins. Co.*, the underlying complaint contained allegations that restoring the impaired property (the building) to use required removing the insured's carpet tiles and installing air filters and bead-blasting the floor. These measures, which went beyond simply removing the insured's defective carpet tiles, fell "outside the definition of impaired property." *Essex Ins. Co.*, 562 F.3d at 408. The City's complaint contains no such allegations, nor do the allegations in the complaint support an inference that any action was required beyond the replacement of Plaintiff's product or work to restore the DCU Center rink to a usable condition.

Because the complaint leaves open no question that the Impaired Property exclusion bars coverage under the Policy, the Defendants had no duty to defend or indemnify. *See Am. Home Assurance Co.*, 467 F.3d at 816-17; *Bond Bros. v. Robinson*, 471 N.E.2d 1332, 1336 (Mass.

1984) ("There is nothing about the general nature or purpose of a comprehensive general liability insurance policy that would lead an insured reasonably to expect that the policy covered a loss of the type involved here, caused by his breach of contract and poor workmanship."); *Davenport*, 778 N.E.2d at 1038, at *1; *contrast Essex Ins. Co.*, 562 F.3d at 408-09.

    C.    <u>Plaintiff's Chapter 93A Claim</u>

Plaintiff brings one count against Defendants for violation of Massachusetts General Laws ch. 93A (Dkt. No. 1-1 at 10) ("Chapter 93A"). With respect to Chapter 93A claims, "[t]he law 'distinguishes between "consumer" and "business" claims, the former actionable under § 9, the later actionable under § 11.'" *Pac. Indem. Co.*, 12 N.E.3d at 1041 (quoting *Frullo v. Landenberger*, 814 N.E.2d 1105, 1112 (Mass. App. Ct. 2004)). To prevail on a claim under Chapter 93A, a plaintiff must show a "'loss of money or property, real or personal,' as a result of [an] unfair or deceptive act or practice, or unfair method of competition, of another person who engaged in trade or commerce." *Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*, 17 N.E.3d 1066, 1076 (quoting Mass. Gen. Laws ch. 93A, § 11, first para.). "An insurance company which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of [Chapter] 93A." *Gulezian v. Lincoln Ins. Co.*, 506 N.E.2d 123, 127 (Mass. 1987). Defendants' interpretation of the Policy was plausible. Further, as Plaintiff was not entitled to a defense or indemnity from Defendants, Plaintiff has not shown a loss of money or property as required for purposes of a Chapter 93A claim. For at least these reasons, Defendants are entitled to judgment on Plaintiff's Chapter 93A claim.

    V.    <span style="font-variant: small-caps;">Conclusion</span>

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Dkt. No. 22) is DENIED; the Defendants' Motion for Summary Judgment (Dkt. No. 25) is GRANTED.

Judgment shall enter accordingly and the Clerk's Office is directed to close this case on the court's docket.

It is so ordered.

Dated: August 29, 2019       /s/ Katherine A. Robertson_____
                                      KATHERINE A. ROBERTSON
                                      United States Magistrate Judge